UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES         )
                          )
v.                       )     Docket No.: 1:22-CR-10157-FDS-2
                          )
JAHQUEL PRINGLE     )
     Defendant.       )
_____)

**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

The Defendant, Jahquel Pringle, hereby moves this Court to dismiss the charges against him pursuant to Fed. R. Crim. P. 12, which permits the defendant to raise by pre-trial motion "any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). The statutes under which Mr. Pringle has been charged, 18 U.S.C. §§ 922(a)(2) and (3), and 18 U.S.C. § 922(g)(1), are unconstitutional both facially and as applied to Mr. Pringle and thus, all counts of the indictment against him must be dismissed. In support of this motion, Mr. Pringle submits this memorandum of law.

**BACKGROUND**

On July 14, 2022, Mr. Pringle was indicted on one count of conspiracy to commit illegal transportation or receipt in state of residency of firearm purchased or acquired outside of state of residency, in violation of 18 U.S.C. § 371, and 18 U.S.C. §§ 922(a)(3) and (2) (count one); two counts of illegal transportation or receipt in state of residency of firearm purchased or acquired outside of state of residency and aiding and abetting, in violation of 18 U.S.C. §§ 922(a)(3) and (2) (counts two and three); and two counts of being a felon in possession of a firearm, in violation of 18

U.S.C. § 922(g) (counts four and five). *See indictment*, ECF no. 3. The predicate felony for the felon in possession counts is one count of carrying a firearm without a license, in violation of M.G.L. c. 269, § 10(a), of which Mr. Pringle was convicted on February 2, 2017. *See Commonwealth v. Jahquel Pringle*, docket no. 1607-CR-000356 (Dorchester Div. of Boston Mun. Ct.). That case represents Mr. Pringle's sole conviction to date.

## LEGAL STANDARD

The Second Amendment to the United States Constitution mandates that a "well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment protects an individual's right to possess and carry a firearm both within and outside the home. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (inside the home); New *York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022) (outside the home).

The Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), set forth a two-step framework for evaluating the constitutionality of restrictions on an individual's Second Amendment rights. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. The first step in this framework, then, is to determine whether an individual's conduct is covered by the Second Amendment. *Id.* If it is, "the *government must demonstrate* that the regulation [infringing on that conduct] is consistent with this Nation's historical

tradition of firearm regulation." *Id.* (emphasis added); *Range v. Attorney General*, 69 F.4th 96, 101 (3d Cir. 2023).

Before looking more closely at what the *Bruen* framework requires, it is important to note that any discussion of the purported "presumptive constitutional[ity]" of firearms regulations in *District of Columbia v. Heller*, 554 U.S. 570, 626-627 & n.26 (2008) – or, for that matter, in any other case – which was addressed to regulations not at issue in the case, is dicta. To conclude otherwise would violate the "one doctrine more deeply rooted than any other in the process of constitutional adjudication[:] . . . that [a court] ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *See Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944).

Relying on such dicta and citing extensively to Justice Alito's concurrence in *Bruen*, a Justice of this Court recently asserted that *"Bruen's* holding did not displace laws about who may lawfully possess a firearm or the requirements that must be met to buy a gun" and that "the *Bruen* Court seemed to caution against reading its decision as one that alters the framework regulating firearm commerce."[1] *United States v. McNulty*, no. 22-cr-10037-WGY, 2023 WL 4826950, at *4-*5 (D. Mass. July 27, 2023) (Young, J.) (citing *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring)). However, the citations following these assertions – to Justice Alito's

[1] Conversely, a Massachusetts state judge recently observed that "[t]here is no question that the holding of the U.S. Supreme Court in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 141 S. Ct. 2111 (2022), has changed the legal landscape on how the second amendment of the Constitution is interpreted, *particularly how it affects existing firearm statutes and challenge to their constitutionality.*" *Commonwealth v. Donnell*, no. 2211CR2836, slip op. at 2 (Lowell Dist. Ct. Aug. 3, 2023), attached as Exhibit 1.

concurrence in *Bruen* – prove their invalidity. Justice Alito's concurrence was not joined by any other Justice of the Court. *See Bruen*, 142 S. Ct. at 2156 (Alito, J., concurring). An opinion, including a concurrence, by any less than a majority of the Court is not binding precedent. *See Texas v. Brown*, 460 U.S 730, 737 (1983) (plurality decision never adopted by majority of Court is not binding precedent); *American Tel. & Tel. Co. v. Communication Workesr of Am., AFL-CIO*, 985 F.2d 855, 859 (6th Cir. 1993) ("Justice Brennan's concurrence in *Yellow Transit* is not binding precedent"); *State v. Montano*, No. F22-10127, 2023 WL 3627117, at *4 (Fla. Cir. Ct. May 24, 2023) ("But Justice Alito, Justice Kavanaugh, and the Chief Justice did not write the Court's opinion in *Bruen*. Justice Thomas did.").

However, even assuming for the sake of argument that the *Heller* language were not mere dicta, a conclusion that any challenged firearms regulation enjoys a presumption of lawfulness post-*Bruen* is untenable. As stated, the first step towards ultimately determining whether a challenged firearms regulation is lawful under the *Bruen* framework is to determine whether an individual's conduct is covered by the Second Amendment. *Bruen*, 142 S. Ct. at 2136. Nowhere does the *Bruen* Court suggest that this first step of the analysis is to be done with reference to the challenged regulation itself. Instead, a determination of whether conduct falls within the protection of the Second Amendment, and is thus *presumptively* protected, is instead a prerequisite to examining the constitutionality – or lack thereof – of any regulations surrounding such conduct. *Id*. at 2136. This proposition

is observable in the *Bruen* Court's own application of the *Bruen* framework to the controversy in that case.

The *Bruen* Court's first-step analysis of whether the petitioners' conduct – "carrying handguns publicly for self-defense" – was covered by the Second Amendment, was completed without any subsidiary analysis of or even reference to the regulation at issue in the case. *See Id.* at 2134-2135. Only *after* the Court had determined that petitioners' conduct was covered by the Second Amendment, and thus presumptively protected by the Constitution, did it move on to examining the lawfulness of the challenged law regulating that conduct: New York's licensing scheme. *Id.* at 2135. Nowhere in that second step of the analysis did the Court afford the respondents a presumption that the licensing scheme was lawful. *Id.* Instead, the Court required the respondents to show that the challenged law was "consistent with this Nation's historical tradition of firearm regulation." *Id.* Where the respondents could not do so, the law was held invalid. *Id.* at 2156.

Turning more generally to the second step of the *Bruen* framework, where an individual's conduct has been shown to be covered by the Second Amendment, a law regulating such conduct will only be upheld where the government demonstrates that "the regulation [infringing on that conduct] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. Following the principle of "party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. Under *Bruen*, it is the

Government's burden to put forth this record and, in the absence of such record, judgment must enter for the defendant. *See id.* at 2126.

In determining whether the government has met its burden, "not all history is created equal." *Bruen*, 142 S. Ct. at 2136. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.* (quoting *Heller*, 554 U.S. at 634-635) (emphasis in *Bruen*). The *federal* right to bear arms derives solely from the Second Amendment. *See id.* at 2137 (New York State is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, where the "Bill of Rights applies only to the Federal Government"). The Second Amendment was adopted in 1791. *Id.*

"Historical evidence that long predates" the adoption of the Second Amendment "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* "Similarly, [courts] must also guard against giving postenactment history more weight than it can rightly bear." *Id.* "[W]here a governmental practice has been open, widespread, and unchallenged *since the early days of the Republic*, the practice should guide [the court's] interpretation of an ambiguous constitutional provision." *Id.* (emphasis added). However, a practice that began long after the founding, such as a firearm regulation enacted in the 20th-century, "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

Classifying a challenge to the constitutionality of a statute "as facial or as-applied affects the extent to which the invalidity of the challenged law must be

demonstrated and the corresponding 'breadth of the remedy,' but it does not speak

at all to the substantive rule of law necessary to establish a constitutional

violation." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (quoting *Citizens

United v. Federal Election Comm'n*, 558 U.S. 310, 331 (2010)).

## ARGUMENT

I.   **United States Code, title 18, § 922(g) (felon in possession) is
     unconstitutional, both facially and as applied to Mr. Pringle.**

### A. *The Second Amendment's plain text covers possession of a firearm.*

The first step in the *Bruen* framework is to determine whether an

individual's conduct is covered by the Second Amendment, in which case the

Constitution presumptively protects that conduct. *Bruen*, 142 S. Ct. at 2126. Title

18 of the United States Code, § 922(g)(1), makes it unlawful in relevant part for

anyone "who has been convicted in any court of, a crime punishable by

imprisonment for a term exceeding one year" to "*possess* in or affecting commerce,

any firearm or ammunition." 18 U.S.C. § 922(g)(1) (emphasis added). Where the

term "'[k]eep arms' was simply a common way of referring to possessing arms,"

*Heller*, 554 U.S. at 583, the plain text of the Second Amendment covers the

"possess[ion]" of a firearm that § 922(g)(1) criminalizes. *United States v. Bullock*,

No. 3:18-CR-165-CWR-FKB, slip op. at 48 (S.D. Miss. June 28, 2023) (quoting

*United States v. Charles*, No. MO:22-CR-154-DC, 2022 WL 4913900, at *2 (W.D.

Tex. Oct. 3, 2022)) (citations omitted). Therefore, § 922(g)(1), both facially and as

applied to Mr. Pringle, infringes on his constitutional right to possess a firearm outside the home and is presumptively unlawful.

### B. Mr. Pringle is among "the people" protected by the Second Amendment.

Critically, the first step of the framework under *Bruen* requires courts "to look at the '*conduct'* being regulated, not the *status* of the person performing the conduct." *See Bullock*, slip op. at 45 (citing *Bruen*, 142 S. Ct. at 2126) (emphases added). In *Heller*, the Court examined the scope of "the people" referenced in the Second Amendment. *Heller*, 554 U.S. at 579-581. The *Heller* Court concluded that the use of the phrase "the people" in the U.S. Constitution "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community," and *not* to "an unspecific subset" of that community. *Id.* at 580. Thus, the *Heller* Court concluded, the Second Amendment right presumptively "belongs to all Americans." *Id.* at 581. In *Bruen*, the Court reiterated that the Second Amendment guarantees the right to keep and bear arms to "all Americans," *Bruen*, 142 S. Ct. at 2156, not only to those Americans who have no criminal record, *United States v. Daniels*, no. 22-60596, slip op. at 6 (5th Cir. Aug. 9, 2023) (where the Bill of Rights refers to "the people," "it refers to all members of our political community, not a special group of upright citizens").

Persons with felony convictions are part of "the people" and, thus, presumptively have the right to possess firearms under the Second Amendment. *Range v. Attorney Gen.*, 69 F.4th 96, 101–102 (3d Cir. 2023) ("[u]nless the meaning

8

of the phrase 'the people' varies from provision to provision—and the Supreme
Court in *Heller* suggested it does not—to conclude [a felon] is not among 'the people'
for Second Amendment purposes would exclude him from [other constitutional]
rights as well"). *See Kanter v. Barr*, 919 F.3d 436, 453 (7th Cir. 2019) (Barrett, J.,
dissenting) (felons are not "categorically excluded from our national community").
*See also Bullock*, slip op. at 48 (Second Amendment covers possession of firearm by
felon).

The Court's use of the phrase "law-abiding, responsible citizens" in *Bruen*,
142 S. Ct. at 2118, and *Heller*, 554 U.S. at 635, and the *Heller* court's reference to
"longstanding prohibitions on the possession of firearms by felons" do not rebut this
presumption, where "the criminal histories of the plaintiffs in *Heller*, *McDonald*,
and *Bruen* were not at issue . . . , [s]o their references to 'law-abiding, responsible
citizens' were dicta,"[2] as so found by Justice Barrett, *Kanter*, 919 F.3d at 454
(Barrett, J., dissenting), Justice Thomas, *Voisine v. United States*, 579 U.S. 686, 715
(2016) (Thomas, J., dissenting), the Fifth Circuit, *United States v. Scroggins*, 499
F.3d 433, 451 (5th Cir. 2010), the Third Circuit, *Range*, 69 F.4th at 101, and most
recently a Judge of the United States District Court for the Southern District of
Mississippi, *Bullock*, slip op. at 40-42.

"Federal courts have 'no jurisdiction to pronounce any statute, either of a
state or of the United States, void, because irreconcilable with the constitution,
except as it is called upon to adjudge the legal rights of litigants in actual

---

[2] The *Heller* Court "explicitly deferred analysis of the issue" of felon dispossession. *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting).

controversies.'" *Bullock*, slip op. at 41-42 (quoting *United States v. Raines*, 362 U.S. 17, 21 (1960)). Therefore, relying on this dicta to find that persons convicted of felonies are excluded from the Second Amendment's definition of "the people" would "violate[] the 'one doctrine more deeply rooted than any other in the process of constitutional adjudication': 'that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.'" *Bullock*, slip op. at 42 (quoting *Spector Motor Serv.*, 323 U.S. at 105). "Lower courts cannot apply language that is, at heart, an unconstitutional advisory opinion." *Id.*

Additionally, as the Third Circuit observed, "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague." *Range*, 69 F.4th at 102. The Third Circuit reasoned that it could not possibly exclude those "who have committed summary offenses or petty misdemeanors, which typically result in a ticket and a small fine." *Id.* If it excludes only "those who commit 'real crimes' like felonies or felony-equivalents," looking at English common law at the time of the founding, generally "felonies were so serious they were punishable by estate forfeiture and even death." *Id*. Today, felonies "include a wide swath of crimes, some of which seem minor[, a]nd some misdemeanors seem serious." *Id*. Already approaching "hopelessly vague," the use of the word "responsible" in the phrase renders it definitively so. *Id.* "In our republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be considered a 'responsible' citizen." *Id.*

Where the Second Amendment applies to "the people," which presumptively refers to "all Americans," *Heller*, 554 U.S. at 581, and any language suggesting that "the people" refers to a smaller class of citizens is mere dicta, conviction of a felony offense does not remove an individual from among "the people" protected by the Second Amendment. Thus, those convicted of felonies remain among "the people" protected by the second amendment, and § 922(g)(1), excluding them from the same, is presumptively unconstitutional, both facially and as applied to Mr. Pringle.

### C. Section 922(g)(1) is unconstitutional where the Government has not shown that lifetime disarmament of felons "is consistent with this Nation's historical tradition of firearm regulation."

It is the Government's burden to prove that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Thus, the Government must show that precluding all felons from possessing firearms "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. To be constitutional, modern "regulations targeting longstanding problems must be 'distinctly similar' to a historical analogue.'" *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S. Ct. at 2131). While the Government need only identify a "historical analogue, not a historical twin," "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Bruen*, 142 S. Ct. at 2133 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021). Two critical metrics in determining whether historical and modern firearms regulations are similar enough to pass

muster are "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S. Ct. at 2133) (emphases added).

Here, the Government has presented no evidence or argument to date that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. However, the First Circuit, in a pre-*Bruen* decision, observed that "the modern felony firearm disqualification law, 18 U.S.C. § 922(g)(1), is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified." *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011), (abrogated by *Bruen*, 142 S.Ct. at 2111). The First Circuit further observed that § 922(g)(1) "differs considerably from the version of the proscription in force just half a century ago." *Id*.

Examining the history of felon disarmament, the First Circuit noted that the "earliest incantation" of § 922(g)(1) is "the Federal Firearms Act of 1938," which "initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary, but extended to both felons and misdemeanants convicted of qualifying offenses." *Id*. (citing Federal Firearms Act, 52 Stat. 1250 (1938)). "The law was expanded to encompass all individuals convicted of a felony (and to omit misdemeanants from its scope) several decades later, in 1961." *Id*. (citing An Act to Strengthen the Federal Firearms Act, 75 Stat. 757 (1961)). Under the current *Bruen* framework, this history is insufficient to establish that

§ 922(g)(1) "is consistent with this Nation's *historical tradition* of firearm regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added). Additionally, prior to the Court's decision in *Bruen*, the U.S. Department of Justice on multiple occasions, and including in a case in the First Circuit, "formally advanced the position that early American history did *not* support felon disarmament." *Bullock*, slip op. at 64-65 (collecting cases). *See* Brief of Appellee, United States v. Pettengill, No. 10-2024, 2011 WL 1977759, at **27-28 (1st Cir. May 13, 2011) ("18 U.S.C. § 922(g)(1) is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified.").

Now-Justice Barrett, in a dissenting opinion out of the Seventh Circuit, observed that "[f]ounding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). Justice Barrett noted that, as of 2019, "no scholars have been able to identify any" "founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—[] a ban" permanently banning firearm possession by all felons. *Id*. at 454. *See also Heller v. Dist. of Columbia*, 670 F.3d 1244, 1254 (D.C. Cir. 2011) ("[S]tates did not start to enact [felony-based prohibitions on possession] until the early 20th century."); *United States v. McCane*, 573 F.3d 1037, 1048 (10th Cir. 2009) (Tymvokich, J., concurring) ("[M]ore recent authorities have *not* found evidence of longstanding dispossession laws."). To the contrary, Justice Barrett observed that "case law proximate to the adoption of the Fourteenth Amendment show[ed] that persons with felony convictions who had completed their sentenced

had their civil rights *restored*, thereby returning them to the political community."
*Bullock*, slip op. at 46 n.24 (citing *Kanter*, 919 F.3d at 461 (Barrett, J., dissenting)).

As the court in *Bullock* posited, "If America's historical tradition permitted a
felon to repurchase firearms after completing their sentence, why can't [such a
person do so] today?" *Bullock*, slip op. at 52. Against the backdrop presented here,
the Government cannot meet its burden of establishing that § 922(g)(1) "is
consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142
S. Ct. at 2126. Because the Government cannot establish the requisite historical
tradition, § 922(g)(1) is unconstitutional, and counts four and five of the indictment,
charging Mr. Pringle with being a felon in possession of a firearm in violation of 18
U.S.C. § 922(g)(1), must be dismissed.

> ### D. Section 922(g)(1) is unconstitutional as applied to Mr. Pringle where the Government has not shown that a prohibition on possessing firearms based solely on an individual's prior possession of a firearm "is consistent with this Nation's historical tradition of firearm regulation."

Even if this Court determines that there are circumstances under which
§ 922(g)(1) would be constitutional, it nevertheless is unconstitutional as applied to
Mr. Pringle. It is the Government's burden to prove that § 922(g)(1), as applied to
Mr. Pringle, "is consistent with this Nation's historical tradition of firearm
regulation." *Bruen*, 142 S. Ct. at 2126.  Thus, "[t]o preclude [Mr. Pringle] from
possessing firearms, the Government must show that § 922(g)(1), as applied to him,
'is part of the historical tradition that delimits the outer bounds of the right to keep
and bear arms.'" *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S. Ct. at 2127).

Even assuming that, "at a high level of generality," "'felon disarmament' is supported by history and tradition," that does not relieve the District Courts from "determin[ing] the 'original meaning' of a felony conviction." *Bullock*, slip op. at 58 (citing *Bruen*, 142 S. Ct. at 2137). At common law, there were nine felonies: "murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny." *Id.* at 59 (citing Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 464 (2009)). At the time of the founding, "the definition of 'felony' could be distilled into 'crimes punishable by forfeiture and death.'" *Id.* (quoting Alice Ristroph, *Farewell to the Felony*, 53 Harv. C.R.-C.L. L. Rev. 563, 572 (2018)).

Mr. Pringle's criminal history includes a single conviction of a nonviolent felony: unlawful possession of a firearm, in violation of M.G.L. c. 269, § 10(a). *See United States v. Doe*, 960 F.2d 221, 222 (1st Cir. 1992) ("conviction for being a felon unlawfully in possession of a firearm is *not* a 'violent felony' conviction" (emphasis in original)). Chapter 269, section 10(a), of the Massachusetts General Laws fits neither among the nine felonies identified at common law, nor in the definition of "felony" at the time of the founding. Moreover, the crime of unlawful possession of a firearm itself proscribes what is otherwise "the constitutionally protected conduct of possessing a firearm in public," where the possessor lacks a valid firearm license.[3] *Commonwealth v. Guardado*, 491 Mass. 666, 691 (2023).

---

[3] Further, the *Bruen* Court concluded that the Massachusetts' firearms licensing scheme in effect at the time of Mr. Pringle's conviction in 2017 was analogous to New York's unconstitutional licensing scheme. *New York State Rifle Ass'n v. Bruen*, 142 S. Ct. 2111, 2124, (2023). After the Court's decision in *Bruen*, the Massachusetts legislature amended its licensing statute to remove the

As a non-violent felony, unlawful possession of a firearm would not have been included among the felonies precluding firearm possession under federal law until 1961, a full 170 years following the adoption of the Second Amendment. *Range*, 69 F.4th at 104. *See also* Part I(C), above. Where Mr. Pringle's conduct giving rise to the predicate felony—possessing a firearm without a license—would not have been felonious or even criminal at the time of the Second Amendment's enactment, the founders could not possibly have envisioned that a regulation could prohibit him from possessing a firearm on the sole basis that he previously possessed a firearm.

Where, as here, the conduct underlying the charged offense—possession of a firearm—is protected by the Second Amendment, the burden is on the government to prove that § 922(g)(1), as applied to Mr. Pringle, "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. The Government cannot meet its burden to show that possession of a firearm by an individual, like Mr. Pringle, who was previously convicted of a single nonviolent felony offense for possessing a firearm without a license was viewed as a "general societal problem" or otherwise regulated when the Second Amendment was adopted in 1791, or for more than 100 years following its adoption. Therefore, the application of § 922(g)(1) to Mr. Pringle is unconstitutional, and counts four and five of the indictment, charging Mr. Pringle with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), must be dismissed.

---

unconstitutional "good reason" requirement. *Compare* M.G.L. c. 140, § 131, as amended through St. 2014, c, 284, §§ 48, 50, 51, 53, 56, 57, *with* M.G.L. c. 140, § 131, as amended by St. 2022, c. 175, §§ 4-17A.

II.   **United States Code, title 18, §§ 922(a)(3) and (2) (illegal transportation or receipt in state of residency of firearm purchased or acquired outside of state of residency), is unconstitutional as applied to Mr. Pringle.**

    **A. *Sections 922(a)(2) and (3) are, fundamentally, about possession, and the Second Amendment's plain text covers possession of a firearm.***

Mr. Pringle re-incorporates his argument in Part I(A), above, that the Second Amendment's plain text covers possession of a firearm both inside and outside the home. Title 18 of the United States Code, §§ 922(a)(2) and (3), criminalize the transportation or receipt in the state of residency of a firearm purchased or acquired outside of the state of residency.[4] Statutes criminalizing receipt of firearms inherently criminalize possession of firearms, where "receipt is the condition precedent to keeping and bearing arms." *See United States v. Stambaugh*, no. CR-22-00218-PRW-2, 2022 WL 16936043, at *3 (W.D. Okla. Nov. 14, 2022). Critically, *Bruen* not only held that the right to *possess* a firearm outside the home is protected by the Second Amendment, but also that the right to *carry* a firearm outside the home is so protected. *Bruen*, 142 S. Ct. at 2150, 2156.

Although there is some overlap between the definitions of "carry" and "transport," the former is not necessarily a condition precedent of the latter. *See*

---

[4] 18 U.S.C. § 922(a)(2) provides that, with exceptions not relevant here, it is unlawful "for any importer, manufacturer, dealer, or collector licensed under the provisions of this chapter to ship or transport in interstate or foreign commerce any firearm to any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector[.]"

18 U.S.C. § 922(a)(3) provides that, with exceptions not relevant here, it is unlawful "for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by such person outside that State[.]"

*Muscarello v. United States*, 524 U.S. 125, 134-135 (1998) ("'transport' is a broader category that includes 'carry' but also encompasses other activity"). "'Carry' implies personal agency and some degree of possession, whereas 'transport' does not have such a limited connotation and, in addition, implies the movement of goods in bulk over great distances." *Id.* at 134. However, where 18 U.S.C. §§ 922(a)(2) and (3) make it a crime to "transport . . . *any firearm*"—singular—across state lines under most circumstances, the definition of "transport" relevant to this case may apply to the movement of a single good, rather than applying only to "the movement of goods in bulk," and thus hews more closely to the definition of "carry" than the definition of "transport" in *Muscarello*, 524 U.S. at 134.

Additionally, Mr. Pringle's conduct more closely conforms to the *Muscarello* Court's definition of "carry" than that broader portion of the definition of "transport" which excludes "carry," where he is alleged to have personally "take[n] custody of the firearms, and physically transported the firearms from Alabama to Boston hidden in [his] luggage on commercial buses." *Indictment*, ECF no. 3, at 4. It is also alleged that Mr. Pringle kept at least some of these firearms for himself, *id.*, further suggesting that the conduct at issue involves "personal agency and some degree of possession." *Muscarello*, 524 U.S. at 134.

Furthermore, nothing in *Bruen* indicates that the right to carry a firearm in public stops at any State's border. And in a recent case in Massachusetts, the judge concluded that, where the government had pointed "to no historical precedent limiting the reach of one's exercise of a federal constitutional right to only within

18

that resident's state[] borders," an individual does not lose the constitutional right to bear arms while traveling. *Commonwealth v. Donnell*, no. 2211CR2836, slip op. at 4-5 (Lowell Dist. Ct. Aug. 3, 2023), attached as Exhibit 1. Mr. Pringle's alleged conduct in this case is best characterized as possessing firearms outside the home while traveling. Thus, where the core conduct giving rise to this case is possession and carrying of firearms outside the home, such conduct is protected by the Second Amendment and presumptively lawful. Such presumption can only be rebutted if the Government can demonstrate that a prohibition on Mr. Pringle carrying firearms across state lines "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

> ### B. The government has not shown that a prohibition on Mr. Pringle transporting firearms received in Alabama into his state of residence, Massachusetts, "is consistent with this Nation's historical tradition of firearm regulation."

It is the Government's burden to prove that §§ 922(a)(2) and (3), as applied to Mr. Pringle, are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  The Court in *Bruen* stated that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

Here, counsel is aware of no such societal problem that has persisted or been regulated since the 18th century. The specific statute under which Mr. Pringle is charged was enacted in 1968. *See* 82 Stat. 197, 226-229 (1968). Moreover, as with

regulations on possession of firearms, to counsel's knowledge, the first federal proscription against most interstate transport of firearms was enacted in 1938. *See Federal Firearms Act of 1938*, 52 Stat. 1250, 1251 (1938). *See also* David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumberland L. Rev. 585, 589-590 (1987) ("prior to 1934, the sole federal statue on the subject [of restricting the sale or carrying of handguns] was a 1927 ban on the use of the mails to ship firearms concealable on the person").[5] As stated, the *Bruen* court has instructed that courts should not give weight to "20th-century historical evidence" where such evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28.

The Government cannot meet its burden to demonstrate that carrying firearms across state lines, *i.e.*, possessing a firearm outside the home while traveling, as Mr. Pringle is alleged to have done here, was viewed as a "general societal problem" or otherwise regulated when the Second Amendment was adopted in 1791, or for more than 100 years following its adoption. Therefore, counts one through three of the indictment, charging Mr. Pringle with conspiracy to commit and substantive transportation or receipt in state of residency of firearms purchased or acquired outside of state of residency and aiding and abetting the

---

[5] The National Firearms Act of 1934 restricted the interstate sale and transportation of "machineguns, sawed-off shotguns and rifles, silencers, and concealable firearms *other than* pistols and revolvers." David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumberland L. Rev. 585, 593 (1987). *See also* 48 Stat. 1236 (1934). The Attorney General described the act as "little more than 'a Federal Machine-gun act.'" *Hardy*, *supra*. Thus, the first major prohibition on interstate transport of firearms was enacted through the Federal Firearms Act of 1938, 52 Stat. 1250 (1938).

same, in violation of 18 U.S.C. §§ 922(a)(3) and (2) and 18 U.S.C. § 371, must be dismissed.

<h1 style="text-align:center">CONCLUSION</h1>

For the foregoing reasons, Mr. Pringle respectfully requests that this Honorable Court grant this motion and dismiss all five counts of the indictment against him.

Respectfully submitted,
JAHQUEL PRINGLE
By his Attorney,


/s/ Michael Tumposky
Michael Tumposky
BBO No. 660618
Hedges & Tumposky, LLP
88 Broad Street, Suite 101
Boston, MA 02110
T) (617) 722-8220
E) Tumposky@HTLawyers.com


<h1 style="text-align:center">CERTIFICATE OF SERVICE</h1>

I, Michael Tumposky, hereby certify that, on August 15, 2023, I have served a copy of this document, where unable to do so electronically, on all counsel of record.

/s/ Michael Tumposky
Michael Tumposky

<h1 style="text-align:center">L.R. 7.1 CERTIFICATE</h1>

Undersigned counsel has conferred with the Government in good faith prior to filing this motion.

/s/ Michael Tumposky
Michael Tumposky