UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES ) | |
| ) | |
| v. ) | Docket No. 1:22-CR-10157-FDS-2 |
| ) | |
| JAHQUEL PRINGLE ) | |
|    Defendant. ) | |
| ) | |

**SENTENCING MEMORANDUM**

Jahquel Pringle respectfully submits this Sentencing Memorandum in support of his request for a sentence of 36 months. This is the lower end of the sentence of 36 to 48 months that was negotiated in a binding plea agreement pursuant to Fed. R. Crim. P 11(c)(1)(C).[1]

The parties arrived at the plea agreement after significant pre-trial litigation and lengthy and careful negotiations in acknowledgment that this is a sentence that is "sufficient, but not greater than necessary" to satisfy the statutory aims of 18 U.S.C. § 3553(a). The crimes to which Mr. Pringle has pled are serious – and reflective of a period in his life that was reckless and unmoored. It is in recognition of that fact and out of a desire to close that chapter of his life that he has made the choice to accept responsibility and enter into an agreement that puts him in prison for several years during critical years of his adult life and the life of his young son.

---

[1] Pursuant to this agreement, the parties agree that Mr. Pringle's total offense level under the Sentencing Guidelines is 25. Mr. Pringle does not contest Probation's calculation of his criminal history as category II. Based on a total offense level of 25 and a criminal history category of two, the guideline imprisonment range is 63 months to 78 months.

1

This case was the culmination of many factors. Mr. Pringle's choices are one critical factor, but there were many others that were beyond his control. His desire to now close this chapter, as evidence not only by his acceptance of responsibility, but also by his earnest and successful commitment to his own education and betterment for the very first time in his life, is an attempt to wrest control over his life in a way that departs significantly from the early experiences that marked him, and all the choices that followed.

Mr. Pringle's childhood was marked by trauma, instability, and a lack of safety. *See Letter of Tiana Pringle,* attached as Exhibit A. In his earliest years, he witnessed acts of domestic violence committed by his father against his mother. *Id.* After this led to his father being deported to Jamaica, he was raised by a mother who, although loving, struggled to meet the needs of her son. *Id.*; *PSR*, at ¶ 47. These struggles would only increase as Mr. Pringle experienced further traumas.

When Mr. Pringle was eight years old, he was home alone with his sister when three armed men forced their way into their home to burglarize it. *PSR*, at ¶ 48. Mr. Pringle and his sister ultimately fought off the men before running to safety at a neighbor's house. *Id.* This traumatic event had a profound impact on Mr. Pringle's development as a young boy. He was diagnosed with anxiety and began acting out and getting into trouble at school. *PSR*, at ¶¶ 49, 58. Because of Mr. Pringle's struggles, when he was eleven years old, his mother sent him to live with his maternal aunt in Vancouver, Washington. *PSR*, at ¶ 49. His mother hoped a new environment would provide Mr. Pringle with the support she could not and

enable Mr. Pringle to course correct. However, Mr. Pringle, still a very young boy at the time, desperately missed his mother and returned within a year. *Id.* Then, when he was around 16 years old, Mr. Pringle witnessed his cousin have a seizure and start choking. *PSR*, at ¶ 58. Mr. Pringle was so traumatized by this event that he "forgot how to swallow" and stopped eating. *Id.* Mr. Pringle lost a significant amount of weight and ultimately had to be hospitalized in the psychiatric unit at Boston Children's Hospital. *Id.*

Mr. Pringle has always maintained a close relationship with his family, but his unstable environment and persisting anxiety in his young adult years caused him to act out despite their support. The crimes for which Mr. Pringle stands before this court occurred during this period of turmoil. Since then, Mr. Pringle has made a decisive break from his past and has matured exponentially. The magnitude of the change is evident in every aspect of his life—steady employment, an engagement to his long-term partner, and devoted fatherhood to his young son. It is also expressed in his commitment to the development of others—civic engagement and his unwavering support of his family. The Court should recognize this new direction he has chosen and impose a sentence of 36 months imprisonment.

**ARGUMENT**

## I. THE PROPOSED SENTENCE IS SUFFICIENT AND APPROPRIATE UNDER THE FACTORS IDENTIFIED IN 18 U.S.C. § 3553(a)

The primary directive in 18 U.S.C. § 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the

goals set forth in § 3553(a).[2] Courts often arrive at the conclusion that criminal conduct requires lengthy prison terms to effectively "punish" or "teach someone a lesson." However, when more effective solutions are available—or when those lessons are already being achieved by other means—prison is counterproductive for both the offender and society.

In this case, a sentence of 36 months is more than sufficient to achieve the purposes of punishment. A longer sentence would ultimately be a *subtractive* act, since it will only serve to further expose Mr. Pringle to a criminogenic environment without any added benefit, while preventing him from maintaining present parenthood of his young son and achieving a stable career. A 36-month sentence, by contrast, is a restorative solution for Mr. Pringle, for the people who have come to rely on him, and the people he has yet to reach, and is sufficient to deter any future criminal behavior.

### A. Mr. Pringle's history and characteristics, and the circumstances of this offense, render the requested sentence sufficient and appropriate under § 3553(a)(1).

Those closest to Mr. Pringle describe him as a kind and caring father, partner, brother, and employee. His friends and family agree that Mr. Pringle puts

---

[2] Those factors include:
  (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
  (2) The need for the sentence imposed—
      (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
      (B) To afford adequate deterrence to criminal conduct;
      (C) To protect the public from further crimes of the defendant; and
      (D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

the needs of others before his own, strives to better his community, and prioritizes giving his son a better childhood than he had. Each can describe instances in which Mr. Pringle positively impacted the lives of those around him.

Although Mr. Pringle now has significant support from his family, as will be discussed below, as a teen and young adult, he struggled to find a productive way to process the traumas he had experienced as a child, and the feeling of unsafety that persisted as a result. It is in this context that Mr. Pringle acquired his own firearms, and in which he became involved in the offense conduct.

Mr. Pringle found himself in an environment where firearms were readily available and accessible, and ultimately ended up becoming involved in the transportation of a number of firearms in the summer of 2020. It is notable that Mr. Pringle's role was that of a broker—his primary actions being the brunt work of traveling between Massachusetts and Alabama. Although Mr. Pringle coordinated with Brandon Moore to arrange purchasing firearms, he was not involved in sourcing the firearms. Within the described offense conduct, it was Mr. Moore who solicited and caused other individuals to purchase firearms in Alabama for him to then sell to individuals like Mr. Pringle. And Mr. Pringle engaged in the offense conduct due to his own naive and misguided belief – rooted in his many childhood traumas, but in particular the violent home invasion he survived at the age of eight years old – that firearms would keep him and those around him safe. Since the time of the offense conduct, however, Mr. Pringle has realized the erroneous nature of his

thinking surrounding firearms and has taken actions to leave this dark chapter in his life behind him.

Mr. Pringle's previous actions do not define the man he has matured into. First and foremost, Mr. Pringle's community describes him as a devoted and loving father. Alexis Watson, the mother of Mr. Pringle's young son, describes how Mr. Pringle has always exhibited qualities of leadership, compassion, and a desire for self-improvement since the time she met Mr. Pringle when they were both seventeen years old. *See Letter of Alexis Watson*, attached as Exhibit B. Ms. Watson explains that upon becoming a father, Mr. Pringle made a conscious effort to create a better future for himself and his son. *Id.* He embraced responsibility, worked diligently, and sought to provide a stable environment for his son. *Id.* Ms. Watson says that even during his incarceration, Mr. Pringle's commitment to fatherhood has been unwavering and he communicates with his son often to stay as involved in his life as possible. *Id.*

This perspective is shared by Mr. Pringle's aunt, Sherletha Perron. Mr. Pringle lived with Ms. Perron and her husband in their Vancouver, Washington home for several months in 2020 while finding a job and saving money for his own apartment. *See Letter of Sherletha Perron*, attached as Exhibit C. Ms. Perron recalls that once Mr. Pringle moved out on his own, he worked hard to provide a bright future for his son. *Id.* Mr. Pringle went above and beyond ensuring that his son's basic needs were met. Mr. Pringle enrolled his son in various extracurricular activities, took him and their two dogs on walks to explore the natural beauty of the

6

Pacific Northwest, and brought his son to monthly family game nights at his aunt's home. *Id.* Mr. Pringle's previous supervisor, Sara, recalls that Mr. Pringle would come to work after each weekend and describe the outdoor adventures he had shared with his son. *See Letter of Sara Nichols*, attached as Exhibit D. Additionally, Mr. Pringle's long-term partner, Tekiyah Barrows King, explains that she has "never met a man more dedicated to being a great father." *See Letter of Tekiyah Barrows King*, attached as Exhibit E. Tekiyah states that Mr. Pringle helped his son with his homework, stayed in touch with his son's teacher, helped his son with any challenges he faced, and always pushed his son to be a respectful young man. *Id.* Just one month prior to his arrest, Mr. Pringle planned and hosted a well-attended birthday party for his son's sixth birthday. *See Exhibit C*

The traits that make Mr. Pringle a loving and attentive father extend beyond just his relationship with his son. In all aspects of his life, Mr. Pringle strives to show kindness and support to those around him. Mr. Pringle's previous supervisor describes Mr. Pringle as being honest, trustworthy, and dependable. *See Exhibit D.* It is these traits that compel Mr. Pringle's previous supervisor to further describe Mr. Pringle as playing a very important role on her team and being an outstanding worker. *Id.*

Additionally, Mr. Pringle's older sister, Tiana Pringle, explains how she was able to depend on Mr. Pringle throughout their difficult childhood together. She recalls one event, when the two were young and home alone, in which their house

7

was robbed. *See Exhibit A*. Tiana[3] says that she could see the fear in Mr. Pringle's eyes, but also his urge to protect her. *Id*. Mr. Pringle put Tiana first and stopped to fight off one of the men, giving Tiana more time to run away. *Id*. Tiana says that to this day, she calls Mr. Pringle whenever she is faced with a difficult situation. *Id*. Tiana describes Mr. Pringle as a great dad and an amazing brother who has only grown and matured since their difficult childhood. *Id*. Even during his incarceration, Mr. Pringle continues to call Tiana regularly to check on her and discuss his hopes of moving forward in life. *Id*.

Another of Mr. Pringle's aunts, Marissa Freedman, also recalls a specific event in which Mr. Pringle's actions exemplified his compassion for others. Ms. Freedman has a child—Mr. Pringle's cousin—who is severely disabled. *See Letter of Marissa S. Freedman*, attached as Exhibit F. Ms. Freedman recalls a dinner she hosted in which Mr. Pringle insisted on helping to feed his cousin before himself. *Id*. Mr. Pringle allowed the rest of his family to continue with dinner while he prioritized the needs of his cousin. *Id*. Marissa also explains that she speaks with Mr. Pringle at least twice a week and that these calls consist of prayer, positivity, and conversations regarding the wellbeing of their family members. *Id*. She describes Mr. Pringle as intelligent, funny, good at heart, and open to learning. *Id*.

Finally, Mr. Pringle's long-term partner, Ms. Barrows King, speaks to the way Mr. Pringle has changed her life, actions he has taken to give back to his community, and his plans to grow moving forward. Tekiyah explains that she met

---

[3] Because Tiana Pringle shares a last name with the defendant, she is referred to by her first name for clarity.

Mr. Pringle when the two were at their lowest points, but that they each pushed each other to reach their goals. *See Exhibit E*. She states that she never knew what she was capable of until she met Mr. Pringle, and that she now has an early childhood teacher's certificate and plans to open her own daycare. *Id*. Ms. Barrows King also describes various community events in which she and Mr. Pringle have participated, including a fundraiser to feed the homeless in Boston and a fundraiser to supplement the cost of books and materials for college freshmen. *Id*. Even while incarcerated, Mr. Pringle participated in a fundraiser in which he sold some of his clothing and household items to help cover the cost of a friend's medical bill. *Id*. Moving forward, Mr. Pringle plans to continue his education to become a veterinary assistant. *Id*. Ms. Barrows King explains that Mr. Pringle loves animals and ultimately wants to specialize in caring for dogs. *Id*.

The magnitude of Mr. Pringle's community support is representative of the kind, caring, and humble man he is. It reflects a shared belief that Mr. Pringle has always held a deep conviction for bettering the lives of those around him, and he has now matured into someone who can consistently support his family and his community. A longer sentence would disrupt the progress Mr. Pringle has made and would undermine rather than advance the purposes of punishment. Mr. Pringle has committed himself to being a devoted father, an exemplary employee, and a loving brother, nephew, and cousin. The requested sentence will enable him to continue to do so.

### B. The requested sentence advances the other objectives embodied within 18 U.S.C. § 3553(a)(2).

The 18 U.S.C. § 3553(a)(2) factors seek to advance the four goals that are typically attributed to sentencing: retribution, rehabilitation, deterrence, and incapacitation. *See United States v. Tapia*, 564 U.S. 319 (2011) ("In determining the appropriate sentence, judges must consider retribution, deterrence, incapacitation, and rehabilitation, §3553(a)(2), but a particular purpose may apply differently, or not at all, depending on the kind of sentence under consideration.)

Retribution refers to just deserts. What is just and the usefulness of the "deserts" is unclear. While retribution may have its place, it should not be elevated above other considerations, and to the detriment of the other three objectives. "Retribution sits uncomfortably at the intersection of two aspects of our responses to harm: our desire for people to suffer and our desire for people to change [....] But there is another option [....] the issue is not just how we show our condemnation, but how we affirm unequivocally and powerfully the importance of what was violated, without destroying the person who violated it."[4] The laws that Mr. Pringle violated are important and exist for a reason. Yet it is equally important to recognize that Mr. Pringle is a young man who was dealing with significant unprocessed trauma at the time of his offense, and who has since demonstrated a sincere intent to leave such conduct in the past. He is also a man of notable compassion and intelligence who has matured to a degree necessary to harness these traits for the good of his community. *See Exhibits A, F*. A just sentence will

---

[4] Sered, Danielle, *Until We Reckon, Violence Mass Incarceration and the Road to Repair*. New York: The New Press, at 89-90.

10

punish his criminal conduct, but should also seek to preserve, rather than squander those good traits.

In this context, a sentence of 36 months would promote respect for the law pursuant to § 3553(a)(2)(A) because "the unique facts of Mr. [Pringle's] situation" support the conclusion that "a sentence of [excessive] imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007) (citations omitted).

To determine what "just punishment" is for Mr. Pringle under 18 U.S.C. § 3553(a), it is important not just to consider the obvious and immediate implications of the carceral sentence imposed, but to also consider the broader implications of the sentence. Those who have been convicted and incarcerated face numerous penalties beyond those imposed in the courtroom—including employment discrimination, occupational restrictions, financial loss, and barriers to reentry.[5]

---

[5] One court has commented on the penalties often overlooked when considering what is "just punishment":

> [T]here is more to the concept of just punishment and deterrence of the particular individual than the temporal and physical hardships imposed by a sentence as measured by the length of time in prison pre-specified by a guidelines range. In fact, beyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement…. In essence, the court's discretion to depart is a manifestation of the necessity for a just sentencing scheme to include provisions for that reasoned intuitive judgment, rather than a hard, deterministic formula, to govern the rare case…. The concept of what is "just punishment" thus contemplates a prospective, empirical assessment, necessarily imprecise, of the accumulation of reasonably foreseeable, ordinary hardships and suffering that any given offender is likely to experience in the typical case during the course of a particular range of imprisonment.

Finally, there is also no rehabilitative value for a sentence any longer than that proposed. Indeed, Congress itself has "recognize[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582(a). Mr. Pringle does not need a longer sentence to promote rehabilitation or specific deterrence; he has demonstrated, through his custodial conduct, that he has assumed responsibility for his own rehabilitation – through his engagement in work and correctional programming, and through his infraction-free record.[6] *See Letter and Certificates of Completion from Wyatt Detention Facility*, attached as Exhibit H.

### C. The requested sentence will adequately deter the general public and Mr. Pringle, and will adequately protect the public.

Research consistently indicates that although the ***certainty*** of being caught and punished does have a deterrent effect, "increases in ***severity*** of punishments do not yield significant (if any) marginal deterrent effects." M. Tonry, *Purposes and*

---

*United States v. Mateo*, 299 F. Supp. 2d 201, 209-211 (S.D.N.Y. 2004) (citations omitted).

[6] *See* Joshua C. Cochran et al., *Does Inmate Behavior Affect Post-Release Offending? Investigating the Misconduct Recidivism Relationship Among Youth and Adults*, 31 Just. Quarterly 1044, 1060 (2012) ("[I]nmates who engage in misconduct are more likely to recidivate and the effect is greater among inmates who engage in greater amounts or types of misconduct." Inferentially, the converse must also be true – those who do not engage in misconduct during incarceration are less likely to recidivate.); Lois M. Davis et al., *Evaluating the Effectiveness of Correctional Education: A Meta-Analysis of Programs that Provide Education to Incarcerated Adults*, at xvi (2013)[6] ("[I]nmates who participated in correctional education programs ha[ve] 43 percent lower odds of recidivating than inmates who did not… This translates into a reduction in the risk of recidivating of 13-percentage points for those who participate in correctional education programs versus those who do not."); *Prison Reform: Reducing Recidivism by Strengthening the Federal Bureau of Prisons,* U.S. Dep't of Just. (March 6, 2017)[6] ("Research shows that inmates who worked in prison industries were 24 percent less likely to recidivate and 14 percent more likely to be gainfully employed after release from custody than other inmates."); Gabrielle Beaudry et al., *Effectiveness of Psychological Interventions in Prison to Reduce Recidivism: A Systematic Review and Meta-Analysis of Randomised Controlled Trials*, 8 Lancet Psych. 759, 768 (2021) (finding evidence of reduced odds of reoffending for individuals who engaged in psychological interventions while incarcerated).

*Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*[7] Thus, long prison sentences are not an effective method for combating recidivism. In some circumstances, a longer sentence can even have the perverse consequence of *increasing* the likelihood of re-offense, by undercutting the defendant's social connections to family, community, and employers. *See* V. Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 7 (2010).

In addition, the requested sentence is more than sufficient to deter future criminal behavior by Mr. Pringle, and thus meets the specific deterrence goals of sentencing. There are numerous compelling reasons to believe that Mr. Pringle presents a low risk of recidivism. First, from the early moments of the prosecution, Mr. Pringle was clear that he wanted to accept responsibility and denounce his own conduct. *See Letter of Jahquel Pringle*, attached as Exhibit G. Second, Mr. Pringle's conduct leading to this case arose out of untreated mental health issues related to past traumas, which he has now acknowledged for the first time in his adult life and for which he is or plans to pursue treatment. *PSR*, at ¶ 60. Finally, since before his arrest, Mr. Pringle has begun the difficult work of setting his life on a positive trajectory: he is renewing critical connections with family that were previously lost,

---

[7] *See also* S.N. Durlauf & D.S. Nagin, *Imprisonment & Crime: Can Both Be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011)[7] ("The key empirical conclusions of our literature review are that at prevailing levels of certainty and severity, relatively little reliable evidence of variation in the severity of punishment having a substantial deterrent effect is available and that relatively strong evidence indicates that variation in the certainty of punishment has a large deterrent effect, particularly from the vantage point of specific programs that alter the use of police.").

and he has consistently engaged in pro-social behavior in detention, demonstrating a strong worth ethic and respectful attitude towards both staff and peers, and taking full advantage of the available educational opportunities designed to assist him in being a positive community member, both during and after incarceration. *See Exhibit G.*

As to specific deterrence, at the time of the instant offense, Mr. Pringle was engaged in a pattern of destructive behavior that arose following traumatic experiences in childhood. In accepting responsibility for his actions, Mr. Pringle recognizes that a term of incarceration is appropriate. It is important to acknowledge, however, that the combination of the severity of the charges in this case and the dramatic wake-up call of an impending lengthy prison sentence have been pivotal for Mr. Pringle. He has started to gain insight into his mental health issues, and to see that he will need the support of treatment for anxiety for the foreseeable future. This work, in the context of ongoing treatment, will also best advance the goals of deterrence, rehabilitation, and protection of the public.

Additionally, upon the completion of his term of incarceration, Mr. Pringle will return to family and community supports that are greater in strength and number than any he experienced growing up. *See Exhibit G.* Support at reentry has been widely demonstrated to decrease recidivism. *See* Thomas J. Mowen et al., *Family Matters: Moving Beyond "If" Family Support Matters to "Why" Family Support Matters During Reentry from Prison*, 56 J. Rsch. Crime & Delinq. 483

(2018), and studies cited.[8] Mr. Pringle's community of family and friends are ready, willing, and able to support Mr. Pringle's successful reentry following his incarceration, lowering Mr. Pringle's risk of recidivism. *See Exhibits A, C, E, F.*

There is also data in this case to suggest Mr. Pringle has already been deterred from future conduct and has a corresponding low risk of recidivism: his nearly perfect record over the past fifteen months in detention, particularly when considered in combination with his use of educational and work programs and his obtaining of mental health treatment. *See* Joshua C. Cochran et al., *Does Inmate Behavior Affect Post-Release Offending? Investigating the Misconduct Recidivism Relationship Among Youth and Adults*, 31 Just. Quarterly 1044, 1060 (2012) ("[I]nmates who engage in misconduct are more likely to recidivate and the effect is greater among inmates who engage in greater amounts or types of misconduct." Inferentially, the converse must also be true – those who do not engage in misconduct during incarceration are less likely to recidivate.); Lois M. Davis et al., *Evaluating the Effectiveness of Correctional Education: A Meta-Analysis of Programs that Provide Education to Incarcerated Adults*, at xvi (2013)[9] ("[I]nmates who participated in correctional education programs ha[ve] 43 percent lower odds of recidivating than inmates who did not… This translates into a reduction in the risk of recidivating of 13-percentage points for those who participate in correctional education programs versus those who do not."); *Prison Reform: Reducing Recidivism*

---

[8] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7205225/.
[9] Available at https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/RAND_Correctional-Education-Meta-Analysis.pdf.

*by Strengthening the Federal Bureau of Prisons,* U.S. Dep't of Just. (March 6, 2017)[10] ("Research shows that inmates who worked in prison industries were 24 percent less likely to recidivate and 14 percent more likely to be gainfully employed after release from custody than other inmates."); Gabrielle Beaudry et al., *Effectiveness of Psychological Interventions in Prison to Reduce Recidivism: A Systematic Review and Meta-Analysis of Randomised Controlled Trials*, 8 Lancet Psych. 759, 768 (2021) (finding evidence of reduced odds of reoffending for individuals who engaged in psychological interventions while incarcerated).

### D. As a result of his conviction and incarceration, Mr. Pringle faces the collateral consequence of the perpetuation of the cycle of family separation that characterized so much of Mr. Pringle's childhood.

Without minimizing his personal responsibility in this case, it must be noted that Mr. Pringle was separated from his father due to his father's abusive behavior and later deportation, and Mr. Pringle, though his criminal conduct and incarceration, has now continued the cycle of parent-child separation. The trauma of parent-child separation has been discussed, *supra* at note 1, in the context of Mr. Pringle's childhood separation from his father. It applies with equal force to Mr. Pringle's very young child: his six-year-old son. *PSR*, at ¶ 53. "Children of incarcerated parents face profound and complex threats to their emotional, physical, educational, and financial well-being." Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent Children*, Nat'l Inst. Just. J. 1 (May

---

[10] Available at https://www.justice.gov/archives/prison-reform#_ftn2.

2017).[11] Mr. Pringle's son is clearly an innocent third-party, and his separation from his father constitutes a trauma that threatens his emotional and psychological development. *See* note 1, *supra*.

Parental incarceration, as a cause of family separation, is one of the Adverse Childhood Experiences (ACEs) linked with poor physical and mental health outcomes for children. *See* National Council of Juvenile and Family Court Judges, *Finding Your ACE Score* (2006).[12] Parental incarceration is linked not only to *childhood* health problems but to poorer mental and physical health in adulthood as well. David Murphy & P. Mae Cooper, Child Trends, *Parents Behind Bars: What Happens to Their Children?*, at 1 (Oct. 2015).

In determining what sentence is appropriate for Mr. Pringle, this Court must consider the impact it will have on his young son, including the developmental consequences of each month without his father and how that will impact the rest of his life. The requested sentence most appropriately weighs these consequences with each of the § 3553 factors.

## CONCLUSION

As a young man who had experienced multiple destabilizing traumas early in life – witnessing domestic violence, the deportation of his father, a violent home invasion and robbery, witnessing his cousin's seizure – and who struggled with significant mental health challenges as a result, Mr. Pringle was on a path in which

---

[11] Available at https://www.ojp.gov/pdffiles1/nij/250349.pdf.
[12] Available at https://www.ncjfcj.org/wp-content/uploads/2006/10/Finding-Your-Ace-Score.pdf. *See also* Ctrs. for Disease Control & Prevention, *Adverse Childhood Experiences*, available at https://www.cdc.gov/violenceprevention/aces/index.html (last visited Feb. 8, 2023).

he squandered opportunities and made choices that damaged his family and his community. He has since begun to atone for his actions and demonstrated his potential to do good where he once did harm. He looks forward to a future where his newfound stability will allow him to excel in fatherhood, marriage, professional development, and community engagement. With the requested sentence, that future permits him to remain on the course he set for himself, and to persevere for the benefit of his family, himself, and his community.

        Respectfully submitted,
        JAHQUEL PRINGLE
        By his Attorney,

        /s/ Michael Tumposky
        Michael Tumposky
        BBO No. 660618
        Hedges & Tumposky, LLP
        88 Broad Street, Suite 101
        Boston, MA 02110
        T) (617) 722-8220
        E)Tumposky@HTLawyers.com

**CERTIFICATE OF SERVICE**

I, Michael Tumposky, hereby certify that, on May 30, 2024, I have served a copy of this document, where unable to do so electronically, on all counsel of record.

        /s/ Michael Tumposky
        Michael Tumposky